**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                     :

SHARVETTE LAW PHILMON,         :       CIVIL ACTION
                     Plaintiff,    :
                                       :
    vs.                           :
                                       :

LINCOLN UNIVERSITY,           :      No. 21-1368
                     Defendant.   :
_____:

<u>**MEMORANDUM OPINION**</u>

**PAMELA A. CARLOS**                           **January 19, 2023**
**U.S. MAGISTRATE JUDGE**

Plaintiff Sharvette Law Philmon served as Defendant Lincoln University's Director and Chair of the Nursing Department for three years until she was replaced in that position. She accuses the Defendant of unlawfully discriminating against her in making that decision. Presently before the Court is the Defendant's motion for summary judgment. For the reasons that follow, the motion will be granted.

**I.      BACKGROUND**

    **A.  Factual Summary.**

The parties' employment relationship began in 2016 when the Plaintiff was hired to be the Director and Chair of Lincoln University's Nursing Department.[1] *See* Pl. Dep. Tr. at 51:2–3, 11–12; *id.* at 56:14. At the time of Plaintiff's hiring, Lincoln University's nursing program was in provisional status with the state's board of nursing, because its pass rate on the National Council Licensure Exam ("NCLEX") for registered nurses was below 80%. *See id.* at 53:22–

_____

[1] In addition to her duties as Director, Plaintiff was also required to teach one nursing class each semester. Pl. Dep. Tr. at 56:24–57:1.

55:8. This meant that the program had to create an action plan to reach an 80% pass rate and complete other additional work for the state board of nursing. *See id.* at 54:15–55:3.

For the next three years, the nursing program remained in provisional status with Plaintiff at its helm. *See id.* at 55:6–8. Relevant here, in the fall of 2019, Lincoln University was informed that their nursing program again fell below the 80% pass rate for first-time NCLEX examinees.[2] *Id.* at 192:13–193:2; *see also* Def. App'x at 500. A meeting with the state nursing board was scheduled for December 2019, and Lincoln University intended to request a "pause" on the nursing program for one year, so that the school could focus on professional development in an effort to increase NCLEX pass rates.[3] *See* Pl. Dep. Tr. at 194:14–195:10. To help prepare for this meeting, Lincoln University hired Dr. Shelly Johnson, an outside consultant, to identify where the program could improve, including how the program could increase the NCLEX pass rate.[4] *See, e.g.*, *id.* at 198:4–14; Allen Dep. Tr. at 19:2–24, 21:4–12.

As part of her consultation, Dr. Johnson interviewed the faculty, staff, student success employees, administrators, and select students and alumni. *See* Def. App'x at 673. Among those interviewed was the Plaintiff. Pl. Dep. Tr. at 198:21-199:5. Following her interview, on November 21, 2019, Plaintiff discussed with her supervisor, Dr. Patricia Joseph, some of the initial impressions Dr. Johnson had of the nursing program. *See* Pl. Dep. Tr. at 199:20–201:10. During this conversation, Dr. Joseph told the Plaintiff that the nursing program was at a "crisis

---

[2] In fact, the pass rate had declined from the previous year's rate. Pl. Dep. Tr. at 193:3–6; *see also* Def. App'x at 500. However, after Plaintiff became director, the pass rate rose from 25% to 60%, *see* Joseph Dep. Tr. at 49:21–50:3, and Plaintiff submits that changes she implemented resulted in an increased pass rate for those students whom the changes impacted, *see* Pl. Dep. Tr. at 193:7–194:13.

[3] Prior to attending the December 2019 meeting, Plaintiff was required to submit a performance improvement plan to the state board. Pl. Dep. Tr. at 196:2–5. She timely completed this document with the assistance of the faculty and her supervisor, Dr. Joseph. *Id.* at 196:8–17.

[4] Dr. Johnson was a prior director of Lincoln University's nursing program. *See* Pl. Dep. Tr. at 198:15–20.

level" and that the administration was going to have to make "difficult decisions in the near future." *Id.* at 201:6–21.[5]

Meanwhile, in addition to the upcoming state nursing board meeting, Lincoln University was also preparing for an accreditation visit from the Commission on Collegiate Nursing Education ("CCNE") that was scheduled for early January. *See id.* at 202:13–20. The purpose of the visit was an evaluation for reaccreditation. *See id.* at 203:1–19. Before the visit, the nursing program was required to undergo a "self-study" and submit the results to CCNE. *See id.* at 202:17–204:4. The nursing program's self-study report was due on December 25, 2019. *Id.* at 207:16–17. As director of the program, Plaintiff oversaw, and was responsible for, the nursing department's self-study report. *See id.* at 205:8–24. Although the self-study was ultimately submitted in a timely manner, *see id.* at 211:12–15, Plaintiff did not provide her supervisor, Dr. Joseph, with a completed draft of the report before it was submitted, despite her requests to see it.[6] *See* Joseph Dep. Tr. at 59:15–60:4, 79:6–18; Def. App'x at 505. And according to the Defendant, the final report submitted to CCNE did not contain all the necessary information.[7] Joseph Dep. Tr. 43:8–14; Def. App'x at 677. Despite this, CCNE provisionally approved the nursing program for accreditation, on the understanding that the report would be supplemented with the missing required information. Joseph Dep. Tr. 43:22–44:6.

---

[5] At a previous meeting with the state nursing board, in July 2019, Lincoln University received positive feedback regarding its efforts to improve test scores. Joseph Dep. at 55:3–11.

[6] Six days prior to the deadline, Plaintiff shared a draft of the report with Dr. Johnson, Dr. Joseph, and President Allen through Dropbox. *See* Pl. Dep. Tr. at 208:11–13; Def. App'x at 677. According to Dr. Johnson, Plaintiff had only partially completed two of the sections. Def. App'x at 677. On the day before the report was due, Dr. Joseph emailed the Plaintiff requesting that she share any updates on the report while also offering assistance in this process. Def. App'x at 505. Dr. Joseph indicated that the Plaintiff had not engaged her in this process. *Id.* Plaintiff did not respond to these emails until 8:00 p.m. the next day. Def. App'x at 504. Plaintiff explained that she was not checking her email during this time but that she was working on the document and was unaware that it was not updating in Dropbox. Pl. Dep. Tr. at 210:4–13.

[7] Furthermore, Dr. Joseph felt that Plaintiff failed to include other members of the campus community in the process of developing the report. Joseph Dep. Tr. at 43:2–7.

Around the same time that the self-study report was due, Dr. Johnson provided Lincoln University with her final evaluation of the nursing program. *See* Def. App'x at 671–81. Notably, Dr. Johnson recommended that Lincoln University replace Plaintiff as the director of the nursing program. *Id.* at 677. Her reasoning was that Plaintiff had shown an inability to manage the program and that she had failed to meet certain requirements. *Id.* at 677–78. Dr. Johnson warned that Plaintiff's "mismanagement" placed Lincoln University in "legal jeopardy," and therefore she should be replaced by January 6, 2020. *Id.* Lincoln University acted in accordance with this recommendation,[8] and on January 6, 2020, Plaintiff was removed from her position as Director of Nursing with the University. *See* Pl. Dep. Tr. at 111:13–14. However, she remained on staff as an associate professor. *See id.* at 112:4–5.

Before she was removed as director, and starting in the fall of 2019, Plaintiff began suffering from a major depressive episode, causing her fatigue which delayed when she was able to arrive at work in the mornings. Pl. Dep. Tr. at 62:19–24, 72:9–12. The constant stress she felt also impacted her ability to focus and manage her responsibilities. *Id.* at 72:13–16. So, on November 25, 2019, she reached out to Lincoln University's Director of Human Resources, Jake Tanksley, and disclosed that she had a disability and requested certain accommodations, such as the ability to attend meetings by Zoom.[9] *Id.* at 79:7–14, 84:11–13; *see also* Def. App'x at 334–36. She also mentioned that she believed that her supervisors, among others, created a hostile

---

[8] Dr. Joseph recommended that Plaintiff be removed Plaintiff from the director position, and President Allen accepted the recommendation and made the final decision. *See* Joseph Dep. Tr. at 57:22–58:8. Dr. Joseph's recommendation was based significantly on Plaintiff's performance in late 2019. *Id.* at 40:19–41:16. Specifically, Dr. Joseph was concerned about the nursing program's success, as well as the Plaintiff's handling of the self-study report and the lack of preparation for the accreditation visit. *See id.* at 40:19–43:7. Moreover, the University had been notified by Dr. Johnson that she too was concerned with Plaintiff's performance as director. Def. App'x at 677–78.

[9] She also requested permission to work from home two days a week and to have a later start time in the day. Def. App'x at 335–36.

work environment for her and had unreasonable expectations of her.[10] Pl. Dep. Tr. at 79:14–16; *see also* Def. App'x at 335. She intentionally chose not to disclose the exact nature of her disability in this initial letter.[11] Pl. Dep. Tr. at 86:4–11.

Mr. Tanksley responded a few days later and advised that Plaintiff needed to complete an accommodation form in order for her requests to be considered. *See* Def. App'x at 337. He also inquired as to whether Plaintiff had discussed the request with her supervisors. *Id.* Plaintiff responded a few weeks later, informing Mr. Tanksley that she had not yet received the accommodation request form he mentioned and also that she was uncomfortable discussing her accommodation request with her supervisors. Pl. Dep. Tr. at 106:19–107:20; *see also* Def. App'x at 346. Mr. Tanksley thereafter ensured that the Plaintiff received the accommodation request form from a member of the human resources team.[12] Pl. Dep. Tr. at 109:22–110:7; *see also* Def. App'x at 348–50.

Plaintiff did not return a completed version of this form until January 31, 2020, after she had already been removed as director of the nursing program.[13] *See* Pl. Dep. Tr. at 110:10–111:14; *see also* Def. App'x at 354. On this form, Plaintiff's physician advised that Plaintiff

---

[10] At her deposition, Plaintiff expanded upon the unreasonable expectations allegation, saying that her supervisors would text her about work during off-hours, conduct "impromptu meetings" about student grades, and suggest that she "do whatever it takes" to get students to pass. Pl. Dep. Tr. at 87:18–92:14. As for hostility, the Plaintiff pointed to a meeting where she felt her supervisor belittled her in front of other faculty, *see id.* at 98:12–14, and an instance where the president of the university, Dr. Allen, told the Plaintiff to "toughen up," *see id.* at 98:20–99:5.

[11] Plaintiff believed that she had disclosed her disability status on her application for employment, but when later presented with her application, she confirmed that it was not included. Pl. Dep. Tr. at 84:15–24. Rather, she believes that upon her hiring and prior to her taking a drug test, she informed a human resources employee that she was taking Adderall for her disability and sent a confirmation letter from her doctor, along with a list of all of her medications. *Id.* at 76:12–24.

[12] There was a miscommunication or misunderstanding and a Family and Medical Leave Act ("FMLA"), not an accommodation, request form had originally been sent to Plaintiff instead. Def. App'x at 351.

[13] At some point prior to her removal, Mr. Tanksley discussed her request for an accommodation and hostile work environment claim with Plaintiff's supervisor, Dr. Joseph. *See* Tanksley Dep. Tr. at 31:24 –32:7.

needed to work from home on the days she was not teaching.[14] Pl. Dep. Tr. at 115:17–21; *see also* Def. App'x at 355. Mr. Tanksley thereafter informed Plaintiff that another member of the human resources staff, Gerard Garlic, was now assigned to her accommodations request and that Mr. Garlic would be in touch to gather more information. Pl. Dep. Tr. at 118:1–10; *see also* Def. App'x at 360.

That same day, February 4, 2020, Plaintiff's physician submitted a follow-up letter that suggested additional accommodations that the University should provide Plaintiff, such as allowing her to use technology to teleconference and hold virtual office hours on days that she is not feeling well and permitting her to start her on-campus teaching at 11:00 a.m. or later. Pl. Dep. Tr. at 118:11–120:11; *see also* Def. App'x at 365. Neither Plaintiff nor her physician, at this time, disclosed any of Plaintiff's diagnoses. *Id.* at 120:11–123:5. Therefore, Mr. Garlic reached out to Plaintiff for more details regarding her disability in order to process her request, and he also informed her that the accommodations request form had recently changed and that she would need to complete the updated version.[15] *Id.* at 125:4–24. Rather than provide this information, Plaintiff asked that the University either approve or deny her request solely based on the information she provided thus far. *Id.* at 135:10–20; *see also* Def. App'x at 382.

The University declined to make a decision on the limited information that they had, instead choosing to further engage with the Plaintiff in the accommodation process. *See* Pl. Dep. Tr. at 136:3–15. On February 14, 2020, Mr. Tanksley emailed Plaintiff another accommodation request form and specified that he needed more information on (1) Plaintiff's disability, (2) how

---

[14] Plaintiff had been assigned to teach the Capstone and Mental Health courses for the Spring 2020 semester. Pl. Dep. Tr. at 113:1–7. This required her to teach three days each week. *Id.* at 113:8–15. The remaining days involved advising students and allowing Plaintiff to prepare her curriculum. *Id.* at 113:16–20, 116:6–13.

[15] Plaintiff disputes that Mr. Garlic was asking for her specific diagnoses. Pl. Dep. Tr. at 134:11–14.

that disability impacts her ability to perform her job duties, and (3) the expected length of time that Plaintiff would need the accommodations. *Id.* at 137:15–138:4; *see also* Def. App'x at 396, 402. Plaintiff questioned why this information was necessary to process her request. *See* Pl. Dep. Tr. at 138:9–15. Mr. Tanksley explained that the information was needed to determine whether a requested accommodation could be provided. *See* Def. App'x at 411. Plaintiff did not further respond, despite Mr. Tanksley following up with her. Pl. Dep. Tr. at 145:3–146:8; *see also* Def. App'x at 413.

As these conversations were ongoing, the COVID-19 pandemic struck, and starting in March 2020, Lincoln University switched to remote classroom instruction. Pl. Dep. Tr. at 146:9–21. This lasted for the entire Spring 2020 semester, and Plaintiff did not teach any courses over the summer. *See id.* at 149:18–150:5. In anticipation for the upcoming academic year, Mr. Garlic reached out to Plaintiff in June to inquire as to whether he could further assist her in obtaining disability accommodations. *Id.* at 154:15–20; Def. App'x at 418. Although Plaintiff responded with the accommodations she anticipated needing and she expressed some of her concerns (such as the fact that she had not yet received her contract from the school and that most of the nursing courses started before 11:00 a.m.), *see* Def. App'x at 420–22, she had not yet returned the accommodation form that Mr. Tanksley sent her in February. Regardless, the classes she was assigned to teach for the Fall 2020 semester were mostly remote, except for one class—Clinical Fundamentals of Nursing, *see* Pl. Dep. Tr. 151:6–17, 153:9–13. Plaintiff requested that it too be taught remotely, so that she could minimize the risk of being exposed to COVID-19 in a hospital setting. *Id.* at 151:13–152:15; *see also* Def. App'x at 431–33. To support this request, a grievance was filed by the union on Plaintiff's behalf. Def. App'x at 434–44. However, the grievance specifically requested that Plaintiff not teach the Clinical Fundamentals course, rather

than teach it remotely.[16] *See id.* The University agreed and instead permitted Plaintiff to perform a different assignment. Pl. Dep. Tr. at 162:20–164:16.

In Spring 2021, Plaintiff again was permitted to teach all of her classes remotely. *Id.* at 166:4–18. Not long after the semester began, however, Plaintiff applied for short-term disability benefits and Family and Medical Leave Act ("FMLA") leave. *Id.* at 167:12–18. She was granted FMLA leave, starting on February 6, 2021. *Id.* at 167:19–23. While on leave, in April 2021, Plaintiff's physician submitted additional information to the University regarding her disability (which had originally been requested back in February 2020). *Id.* at 168:2–169:19; *see also* Def. App'x at 446–49. Among that information was documentation indicating that Plaintiff was able to return to work full time without restrictions, but at the same time, her physician included proposed accommodations. Pl. Dep. Tr. at 170:6–22; *see also* Def. App'x at 448–49. Human Resources sent a letter directly to Plaintiff's physician asking that she clarify this inconsistency. Def. App'x at 454–56; *see also* Pl. Dep. Tr. at 171:22–24. Plaintiff's physician responded to the letter, but still failed to explain the inconsistency. *See* Pl. Dep. Tr. at 175:1–15. Instead, she complicated matters more by stating that Plaintiff was able to return to work full time without restrictions except for "the accommodations requested in 2020." Def. App'x at 460; *see also* Pl. Dep. Tr. 175:1–15. Again, the University contacted the Plaintiff's physician, this time requesting that she specify Plaintiff's current conditions that require restrictions, her prognosis, and the extent to which the conditions affect the Plaintiff's ability to perform the essential functions of her job.[17] Def. App'x at 464–70.

---

[16] Plaintiff claims that she was unaware that an official grievance was filed or that the union asked that she not teach the course at all. Pl. Dep. Tr. at 159:16–162:5.

[17] In June 2021, Plaintiff applied for long-term disability benefits. Pl. Dep. Tr. at 42:22–44:22. In support of her application, Plaintiff's healthcare provider indicated that she has been unable to work since February 2021. Def. App'x at 690. Benefits were granted in September 2021, and Plaintiff remains on long-term disability leave. Pl. Dep. Tr. at 43:7–13. On October 25, 2021, Plaintiff applied for Social Security disability benefits, claiming that she is

Having received no response from Plaintiff's physician, the University reached out to the Plaintiff in August 2021 and let her know that they still needed more information and clarification regarding her accommodations. *See* Def. App'x at 471, 478–81. In early September, Plaintiff responded, informing Mr. Tanksley that her physician would not be providing any more information to the University. *Id.* at 493–94. However, she did provide him with some information related to her chronic and persistent illnesses that had not been previously disclosed. *Id.* This was the first time the University was aware of any of her specific medical conditions. *See id.* Mr. Tanksley continued to follow-up since he still needed more information. *See id.* at 495, 497–99. He even offered to hire a medical examiner on Plaintiff's behalf, considering that her physician was no longer willing to provide any clarification or further information. *Id.* at 498. Plaintiff never responded. Pl. Dep. Tr. at 188:19–189:15.

### B. Procedural History.

Plaintiff initiated the present lawsuit on March 22, 2021, alleging that the Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania's Wage Payment and Collection Law ("WPCL"). *See* Doc. No. 1. Defendant denied these claims, *see* Doc. No. 8, and the parties thereafter engaged in discovery. After the conclusion of the discovery period, Defendant moved for summary judgment on all counts.[18] *See* Doc. No. 18. The parties have fully briefed the issues, *see* Doc. Nos. 23, 24, and the motion is now ready for disposition.

---

unable to work in any job capacity due to her multiple ongoing health conditions. *See id.* at 33:8–34:14; Def. App'x at 691–701.

[18] The parties have consented to the jurisdiction of United States Magistrate Judge to conduct all proceedings, including entry of final judgment, pursuant to 28 U.S.C. § 636(c). *See* Doc. Nos. 26, 27.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate only in cases where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those that "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, the facts and evidence are viewed in "the light most favorable to the nonmoving party." *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

The moving party has the initial burden of showing an absence of a genuine dispute as to any material fact. *See Anderson*, 477 U.S. at 256. This includes any argument that there is no evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After the movant has made this initial showing, the burden then shifts to the nonmoving party to demonstrate that there is sufficient evidence in the record that would support a jury verdict in their favor. *See id.* at 322–23. Importantly, speculation and conclusory allegations by the nonmoving party are not enough to defeat a summary judgment motion. *Razak, Inc.*, 951 F.3d at 144.

## III.     DISCUSSION

Defendant argues that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on every claim. Plaintiff disagrees and points to alleged genuine disputes of material fact regarding her gender discrimination claim, her retaliation

claims, and her wage payment claim.[19] After careful consideration, I agree with the Defendant

that summary judgment is appropriate. I will address each claim in turn below.

_____

[19] Although the Defendant addresses additional discrimination claims that were purportedly raised in the initial complaint, *see* Doc. No. 18-2, at 2–9, 13–22 (discussing race discrimination, disability discrimination, and failure to accommodate claims), Plaintiff ignores these arguments in her response, only defending her gender discrimination, retaliation, and wage payment claims, *see* Doc. No. 23-2. As such, the Defendant urges this Court to find that the Plaintiff abandoned the unmentioned claims and grant summary judgment on that basis. *See* Doc. No. 24, at 2 (citing to *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005); *Evans v. Nine West Grp., Inc.*, No. 00-4850, 2002 WL 550477, at *4 (E.D. Pa. Apr. 15, 2002); and *Carroll v. Lancaster Cty.*, 301 F. Supp. 3d 486, 499, 511 (E.D. Pa. 2018)). However, because the Third Circuit has cautioned that a plaintiff's failure to respond to a summary judgment motion "is not alone a sufficient basis" for granting the motion, *see Anchorage Associates v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990), I find that it is more appropriate to first confirm that "there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law," *see United States v. Brace*, 1 F.4th 137, 143 (3d Cir. 2021), before granting summary judgment on any uncontested claims. Accordingly, I have reviewed the merits of these claims.

First, I agree with the Defendant that there is no evidence in the record to support Plaintiff's claim of race discrimination. Like the gender discrimination claim discussed later in this opinion, the *McDonnell Douglas* burden-shifting framework applies to claims of race discrimination. *See Sarullo v. U.S. Postal Service*, 352 F.3d 789,797 (3d Cir. 2003). As such, to survive summary judgment, the Plaintiff must state a *prima facie* case. *See id.* For race discrimination claims, this means showing that (1) the plaintiff is a member of a protected class, (2) she is qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances surrounding the adverse action raise an inference of discrimination. *Id.*; *see also Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000) (noting that the analysis for race discrimination claims under Title VII and the PHRA are "identical"). Even assuming Plaintiff could make out the first three elements of a *prima facie* case, she has presented no evidence to support a finding that the circumstances surrounding her removal give rise to an inference of race discrimination.

Notably, at the Plaintiff's deposition, she conceded that there was no evidence to support her race discrimination claim. *See* Pl. Dep. Tr. at 71:18–72:3. Rather, her claim was based solely on her "feel[ing] like [she's] being treated differently because of [her] race" and that her supervisors were not taking her seriously because of her race. *Id.* ("I don't know if it's a fact or evidence but I feel like there's something – yes, I feel like I'm being treated differently because of my race, yes, and I was not taken seriously. I was not – my concerns about having a director, needing help was not being viewed as something that was serious. Yeah. So I do believe that me, as an Africa[n]-American female, yes, I was not taken seriously by my supervisors in the University."). And based on my review of the record, there is no other evidence to support her claim. For example, her replacement was an individual that was a member of her protected class, and there is no evidence of comparators who were treated more favorably. Plaintiff's mere speculation that she was discriminated based on her race is not sufficient, as a matter of law, to proceed past summary judgment. *Cf. Razak, Inc.*, 951 F.3d at 144 ("In attempting to defeat summary judgment, '[s]peculation and conclusory allegations do not satisfy [the nonmoving party's] duty." (alterations in original) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999))).

Second, Plaintiff's disability discrimination claim also fails. Under the ADA, disparate treatment disability discrimination claims follow the *McDonnell Douglas* framework. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 298–99 (3d Cir. 2021); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010) ("[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA."). Even assuming she could establish a *prima facie* case, she has not proven that the Defendant's legitimate reasons for removing her were pretextual, as discussed in detail throughout this memorandum opinion.

Third, Plaintiff cannot defeat summary judgment on her failure to accommodate claim. "A plaintiff bringing an ADA failure-to-accommodate claim must establish: (1) [she] was disabled and [her] employer knew it; (2) [she] requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist;

### A.  Gender Discrimination Claim.

Title VII prohibits employers from discriminating against employees because of their sex.[20] 42 U.S.C. § 2000e-2(a)(1).[21] The parties agree that the analysis of Plaintiff's gender discrimination claim is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Doc. No. 18-2, at 3–10 (Defendant's motion); Doc. No. 23-2, at 5–7 (Plaintiff's response). Under that framework, the plaintiff must initially state a *prima facie* case of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). If she has done so, then the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its adverse employment action.[22] *Id.* If the employer has produced such a reason, then the burden shifts back to the plaintiff to demonstrate that the employer's stated reason was pretext for intentional discrimination. *Id.* Although the burden of production

---

and (4) [she] could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 133, 157 (3d Cir. 2017) (internal quotation mark omitted) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 428 F.3d 240, 246 (3d Cir. 2006)). The third prong—the employer's good faith effort to accommodate—involves engaging in an "interactive process" with the employee "so that the employer will be able to ascertain whether there is in fact a disability and, if so, the extent thereof, and thereafter be able to assist in identifying reasonable accommodations where appropriate." *Williams v. Phila. Housing Authority Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004), *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187–89 & n.30 (3d Cir. 2019). The Third Circuit has held that "both the employer and *employee* have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Id.* (emphasis added) (quoting *Megine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)). Putting aside the fact that Plaintiff was ultimately granted permission to work remotely, Plaintiff has not demonstrated that the Defendant acted in bad faith in their effort to accommodate her nor has she shown that she fulfilled her duty to assist the Defendant in the search for an appropriate accommodation. As such, summary judgment is appropriate.

[20] Plaintiff also brings her gender discrimination claim under the PHRA. Because the Third Circuit has recognized that the analysis for gender discrimination claims under the PHRA is "identical" to the analysis under Title VII, *see, e.g.*, *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000); *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006), the above treatment of plaintiff's Title VII claim applies equally to her PHRA claim.

[21] In full, Title VII prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

[22] The employer's burden at this stage is "relatively light." *Burton*, 707 F.3d at 426 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). All the employer needs to show is "evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.*

switches between the parties at the various steps, the burden of persuasion always remains with the plaintiff. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

### 1.   *Prima Facie* **Case.**

To state a *prima facie* claim of gender discrimination, the plaintiff must show that (1) she is member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action "give rise to an inference of discrimination." *Jones v. Southeastern Pa. Transp. Authority*, 796 F.3d 323, 327 (3d Cir. 2015). At summary judgment, the plaintiff must point to evidence that is "sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Burton*, 707 F.3d at 426 (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)).

Here, the Defendant argues that Plaintiff is unable to satisfy two of the four elements of the *prima facie* case.[23] Doc. No. 18-2, at 3–5. In particular, the Defendant challenges the Plaintiff's ability to establish that she was qualified for the position, *see id.* at 3–4, and that the circumstances surrounding her removal as director of the nursing program give rise to an inference of discrimination, *see id.* at 4–5. To support its contention that Plaintiff was unqualified for the director position, the Defendant relies primarily on the outside consultant's negative review of Plaintiff's performance and recommendation for removal. *Id.* at 3–5. As for the inference prong, the Defendant maintains that the record is devoid of any evidence evincing an inference of discrimination (such as comparators who were treated more favorably). *Id.*

Neither argument is successful. First, the Defendant's stance on Plaintiff's qualifications is better suited for consideration at the pretext, not the *prima facie*, stage of the analysis. That is

---

[23] For purposes of its summary judgment motion, the Defendant has conceded that the Plaintiff can establish that she is a member of a protected class and that she suffered an adverse employment action. Doc. No. 18-2, at 3.

because the argument is rooted in a subjective assessment of Plaintiff's performance and not in the objective indicia that are contemplated for this inquiry. *See, e.g.*, *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938–39 (3d Cir. 1997), *abrogated on other grounds by Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).[24] Indeed, the Defendant does not suggest that Plaintiff lacked some objective qualification, such as an educational requirement, for the position. To the contrary, the Defendant hired her for the position, and she served in that capacity for over three years. Taking these facts in the light most favorable to the Plaintiff, I find that she has demonstrated that she was qualified for the director position.[25]

Second, though Defendant is correct that there is no record evidence of comparators treated more favorably than Plaintiff, it is undisputed that she was replaced by someone who is outside of her protected class. *See, e.g.,* Doc. No. 18-3, at ¶ 106 (Defendant's statement of undisputed material facts confirming that Dr. Mattis, who is male, replaced Plaintiff as director of the nursing program); Doc. No. 23-1, at 5 (Plaintiff's statement of undisputed facts stating same). Many courts in this circuit have found that replacing a plaintiff with an individual outside

---

[24] The Third Circuit has aptly explained why consideration of the defendant's subjective assessment of the plaintiff's performance is inappropriate at the *prima facie* stage:

> Determining whether [Plaintiff] satisfied his employer's expectations is, by its very nature, a subjective assessment. Obviously, we cannot evaluate an employer's expectations to see if they have been satisfied as we can objective measures such as, say, educational requirements. In light of this fact, our past rulings prevent satisfaction of an employer's expectations from being a requisite element of a prima facie employment discrimination case. We have held that "while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the *McDonnell Douglas* analysis." The rationale behind this position is that "subjective evaluations 'are more susceptible of abuse and more likely to mask pretext' and, for that reason, are better examined at the pretext stage than at the prima facie stage."

*Matczak*, 136 F.3d at 938–39 (alteration in original) (quoting *Weldon v. Kraft*, 896 F.2d 793, 798 (3d Cir. 1990)).

[25] *Cf. Fletcher v. Inframark*, LLC, No. 21-2509, 2022 WL 3018192, at *3 (E.D. Pa. July 29, 2022) (finding that the fact that plaintiff was hired for, and remained in, the position for "several years" established that he had "the objective qualifications" for the position).

of the plaintiff's protected class may give rise to an inference of unlawful discrimination. *See, e.g.*, *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007) (not precedential).[26] Following these cases, I will assume that such evidence is sufficient for purposes of making out a *prima facie* case of gender discrimination, and therefore I will continue with the analysis of Plaintiff's claim.

## 2.   Legitimate Non-Discriminatory Reason.

Moving on to the second step of the *McDonell Douglas* framework, I find that the Defendant has clearly articulated legitimate, non-discriminatory reasons for removing the Plaintiff as director of the nursing program. Specifically, the Defendant cites three reasons to support its decision: (1) the nursing program's continued struggles, under the Plaintiff's leadership, in reaching the required NCLEX pass rate; (2) Dr. Johnson's independent evaluation of the program and her recommendation that the Plaintiff be removed as director; and (3) the Plaintiff's "mishandling" of preparing for the accreditation visit and accompanying self-study report, including not allowing her supervisors to review the report before its submission. Doc. No. 18-2, 5–7. These proffered justifications satisfy the Defendant's burden, meaning the

---

[26] *See also id.* ("While this Court no longer requires a plaintiff to show that he was replaced by someone outside of the protected class to establish an inference of discrimination, we find that this evidence establishes the fourth and final element of a prima face case in this case." (citations omitted)); *May v. PNC Bank*, 434 F. Supp. 3d 284, 296 (E.D. Pa. 2020) (noting that "[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class." (alteration in original) (quoting *McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *9 (E.D. Pa. Feb. 6, 2008)); *Baron v. Abington Township*, No. 20-5763, 2022 WL 945711, at *5 (E.D. Pa. Mar. 30, 2022) (recognizing that the Third Circuit has not "squarely addressed the issue in a published opinion" but following other courts and assuming "without definitively deciding" that a replacement by someone outside plaintiff's protected class gives rise to an inference of unlawful discrimination); *Henderson v. Montgomery Cty. Community College*, No. 19-1064, 2021 WL 3077549, at *7 (E.D. Pa. July 21, 2021) (explaining that "[i]n the Third Circuit, the fact that a plaintiff was replaced by an individual who is not a member of his or her protected class is sufficient to establish an inference of discrimination." (citing to *Johnson*, 214 F. App'x at 242)).

Plaintiff must now demonstrate that these justifications were pretextual to overcome summary judgment.

### 3. Pretext.

The Plaintiff suggests that she can meet her burden of showing that the Defendant's proffered reasons for her removal are pretext for intentional gender discrimination. *See* Doc. No. 23-2, at 7–10.

Pretext may be shown by presenting "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 764). Under the first approach (undermining the employer's articulated reasons), it is not enough to "simply show that the employer's decision was wrong or mistaken." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 199 (3d Cir. 2015) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014)). Rather, the plaintiff must point to evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." [27] *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644–45 (3d Cir. 2015) (internal quotation mark omitted) (quoting *Fuentes*, 32 F.3d at 764). Under the second approach (demonstrating a discriminatory reason was a motivating factor), the plaintiff may succeed by showing that the employer had previously discriminated

---

[27] The Third Circuit has recognized that "if a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427. The rationale is that "the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.*

against her or others, or that the employer treated similarly situated individuals outside of her protected class more favorably. *See Fuentes*, 32 F.3d at 765.

Plaintiff appears to utilize both approaches to attempt to establish pretext. *See* Doc. No. 23-2, at 7–10. In particular, she points to (1) alleged inconsistencies in the Defendant's proffered justifications for her removal, (2) a statement from her supervisor that, according to her, revealed a preference for a male in the director position, and (3) the fact that her male replacement was provided with an assistant director to help with his duties when she was not afforded the same support. *Id.* But even when considering all of these facts in the light most favorable to the Plaintiff, a reasonable factfinder could not conclude that the Defendant's legitimate justifications for Plaintiff's removal were merely pretext and that the real reason was intentional gender discrimination.

a.   *Inconsistencies in proffered reasons.*

Although the Plaintiff attempts to poke holes in each of the Defendant's stated reasons for her removal, she is ultimately unsuccessful at showing pretext because she fails to present any evidence to suggest that the Defendant's stated reasons are "so plainly wrong" that they "cannot have been [the Defendant's] real reason" for removing Plaintiff. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

First, the Plaintiff takes issue with the Defendant's reliance on the fact that the nursing program continued to struggle to reach the required NCLEX pass rate under her leadership. Doc. No. 23-2, at 8–9. According to Plaintiff, this reason is inconsistent considering the nursing program, since its inception, always had a low pass rate and that under her direction, the pass rate increased from twenty-five percent to sixty percent.[28] *Id.* Moreover, she points to the fact that the

---

[28] Added on to the end of Plaintiff's argument was a brief reference to a statement made by counsel in September 2019. *See* Doc. No. 23-2, at 9. In that statement, counsel wrote that Plaintiff had "made appropriate adjustments to

pass rate subsequently fell to forty percent after her departure as proof that she had a positive

effect on the NCLEX pass rates. *Id.* Yet neither of these alleged inconsistencies could cause a

reasonable factfinder to disbelieve the Defendant's explanation for removing the Plaintiff as

director. With respect to the latter (that pass rates declined after she was removed), even when

considering the facts in the light most favorable to the Plaintiff, all it amounts to is an inference

that in hindsight, the Defendants may not have made the best decision.[29] As for the former (that

pass rates increased under her leadership), though Plaintiff may believe that she had achieved

significant progress in reaching the required pass rate, it is undisputed that the nursing program

was still struggling to achieve that goal, with the most recent results under her tenure showing

only a fifty-four percent pass rate—notably, a decline compared to the year prior. *See* Def. App'x

at 500. As such, Defendant's choice to head in a new direction for this reason is not so

implausible or inconsistent to suggest a discriminatory motive.

Second, the Plaintiff attacks the Defendant's reliance on Dr. Johnson's independent

evaluation of the program and her recommendation that the Plaintiff be removed as director. *See*

Doc. No. 23-2, at 8–9. She appears to argue that Dr. Johnson's conclusions that she is unable to

manage the program and that she has placed the program in legal jeopardy are contradicted by

---

the academic program to accomplish [the] goals set forth by President Allen and the State Board of Nursing." *Id.* (internal quotation mark omitted); *see also* Doc. No. 23-10, at 3. Plaintiff seems to latch on to the fact that her actions as director had at one point been described as "appropriate." Doc. No. 23-2. But she has taken this statement completely out of context: counsel was refuting a separate employee's allegations that Plaintiff's actions were discriminatory, and so counsel, in response, had instead characterized those actions as "appropriate." Doc. No. 23-10, at 3. Regardless, Dr. Joseph, who recommended that Plaintiff be removed, was uninvolved in the preparation of that statement. *See* Joseph Dep. at 10:4–6 ("I do believe that [the employee] did file [an EEOC charge]. I was not involved in it."). As such, even when considering this statement in the light most favorable to the Plaintiff, it does not support a showing of pretext.

[29] The Defendant disagrees with the Plaintiff's interpretation of the test results. They argue that since it is a two-year nursing program, there is a significant delay in noticing the impact of any changes in the program on pass rates, and therefore the drop in pass rates following Plaintiff's departure was actually attributable to her. Doc. No. 24, at 6. However, as explained above, even when accepting the Plaintiff's interpretation of the test results, it does not amount to a showing of pretext.

the program's reaccreditation, that the NCLEX pass rates increased while she was leading the program, and that the self-study report was timely submitted. *Id.* However, those aspects of Plaintiff's leadership that were arguably successful are not inconsistent with—and do not undermine—the numerous criticisms documented in Dr. Johnson's report and that form the basis for her recommendation that Plaintiff be removed. *See* Def. App'x at 673–79. For instance, to support her conclusion that Plaintiff was placing the program in legal jeopardy, Dr. Johnson cited to three educational requirements that Plaintiff failed to meet: (1) her lack of a doctorate degree (or plan to complete one); (2) the faculty's report of being denied the ability to evaluate Plaintiff; and (3) the students' perception that "they are at the mercy of [Plaintiff]."[30] *See id.* (citing, respectively, 49 PA. CODE 21.71-5(2); 29 PA. CODE 21.61-5(6h); and 49 PA. CODE 21.116-5(6h)). Furthermore, Dr. Johnson opined on the deficiencies in Plaintiff's leadership, including, among others, the impulsive and numerous changes, disorganization, procrastination, poor communication with students, faculty, and administration, failure to delegate, lack of transparency and engagement with students and faculty, and lack of accountability. Def. App'x at 674. Again, Defendant's decision to act in accordance with Dr. Johnson's recommendation is not inconsistent with other evidence nor does it suggest a discriminatory motive.

Third, the Plaintiff challenges the Defendant's allegations that she mishandled the preparation and submission of the self-study report. *See* Doc. No. 23-2, at 7–8. For support, she notes that the report was turned in on time; President Allen never asked to review any drafts before the report was submitted, despite Dr. Joseph's testimony to the contrary; and the nursing program was reaccredited soon thereafter. *See id.* But none of these contentions ultimately

---

[30] Dr. Johnson cited, as evidence, the students' complaints of "constant changes in minimum criteria to pass courses and stay in the nursing program; frequent changes in hard workload; frequent changes in courses times without notification and the variability has placed the students in situations where the workload is unmanageable and their financial stability is removed due to inability to maintain scholarship agreements." Def. App'x at 678.

undercut the Defendant's position that Plaintiff "mishandled" the preparation of the self-study report. As the Defendant points out, Dr. Joseph's principal criticism with respect to the self-study report was that it was not timely *prepared*, not that it was untimely submitted. Doc. No. 24, at 5–6; Joseph Dep. at 42:4–6; *id.* at 42:15–43:7. Rushing to complete the report at the last-minute deprived Plaintiff's supervisors from overseeing the process and providing feedback on the final product. *See* Def. App'x at 503–05. In addition, it excluded the rest of the nursing community from contributing to its contents. *See* Joseph Dep. Tr. at 43:1–7. This is a legitimate criticism of the Plaintiff's performance and is unrefuted by the record in this case.

Plaintiff's other attempts to undermine the Defendant's reliance on the circumstances surrounding the preparation of the self-study report fare no better. Though true that President Allen never requested an advance draft of the report, both Dr. Joseph and Dr. Johnson asked to see it beforehand, cc'ing President Allen on their emails. Def. App'x at 503–05. Dr. Joseph's misstatement at her deposition does not significantly call into question her dissatisfaction with Plaintiff's lack of communication regarding the self-study report. As for the program's subsequent reaccreditation, it does not undermine the Defendant's position that Plaintiff mishandled the self-study report such that it could not have been the Defendant's real reason for removing Plaintiff as director. As the Defendant argued in its reply brief, the reaccreditation was only for five years (not the ten years that were available) and it was contingent on preparing and producing additional information that had not yet been provided to CCNE. *See* Doc. No. 24, at 5–6; *see also* Doc. No. 23-8.

As such, I find that the Plaintiff has not presented any evidence of inconsistencies that would cause a reasonable factfinder to disbelieve the Defendant's proffered justifications for Plaintiff's removal.

b.   *Supervisor's statement.*

Next, the Plaintiff relies on one statement from her supervisor, Dr. Joseph, as evidence that a discriminatory reason was a motivating factor in her removal. Doc. No. 23-2, at 7. For context, Plaintiff had a meeting with Dr. Joseph and Dr. Dees in May 2019 to discuss student behavior, specifically how students were treating the Plaintiff in her classroom compared to other faculty. Pl. Dep. Tr. at 66:20–21. During that meeting, Plaintiff remembers Dr. Joseph commenting that the students needed "a man in this job . . . they almost need someone like . . . a grandfather figure or a daddy figure." *Id.* at 66:22–67:6. She now claims that this comment is evidence of Dr. Joseph's discriminatory intent in removing her as director of the nursing program. *See* Doc. No. 23-2, at 7. I disagree.

Looking at the timing and context of Dr. Joseph's comment, I find that, without more, it cannot demonstrate pretext. Significantly, in employment discrimination cases, "[s]tray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992); *see also Keller*, 130 F.3d at 1112 (finding a comment, on its own, was insufficient to establish pretext because it was made four or five months before the decision to discharge plaintiff and it did not "refer to the question of whether [the plaintiff] should be retained or fired"). Here, Dr. Joseph's comment was made *eight months* before Plaintiff was removed as director, and it was in response to Plaintiff's complaints of student behavior toward her as a professor not as director. Simply put, Dr. Joseph's one comment is too remote—temporally and topically—for a reasonable factfinder to believe that "an invidious discriminatory reason" was a motivating or determinative cause of Plaintiff's removal.

c.  *Lack of an assistant director.*

Last, Plaintiff maintains that the Defendant's refusal to provide her with an assistant director is evidence of gender discrimination.[31] *See* Doc. No. 23-2, at 10. To be sure, "when an employer discriminatorily denies training and support, the employer may not then disfavor the plaintiff because her performance is affected by the lack of opportunity." *Ezold*, 983 F.2d at 540. But because there is no evidence that the Defendant denied Plaintiff an assistant director for discriminatory reasons, Plaintiff cannot establish pretext based on the lack of an assistant director. *Cf. Ortiz v. Cedar Crest College*, 764 F. App'x 257, 259 (3d Cir. 2019) ("In an effort to shift blame to the [defendant], [plaintiff] contends it set him up for failure by denying his requests for further training and new equipment. But he does not submit any evidence to suggest it denied that training or new equipment for discriminatory reasons.").

In an attempt to avoid this result, Plaintiff points out that her male replacement was afforded the support of an assistant director. *See* Doc. No. 23-2, at 10. This argument, however, is unconvincing. The Plaintiff conveniently omits, in her brief, the fact that she too was initially provided with an assistant director when she was hired. *See* Pl. Dep. Tr. at 63:3–6. Although that individual left after a semester and the position then remained unfilled, *see id.*, this fact—that both Plaintiff and her male replacement were afforded assistant directors at the outset of their terms—is significant and refutes any suggestion that other individuals outside of Plaintiff's protected class were treated more favorably or that there was a discriminatory reason for denying Plaintiff an assistant director.[32]

---

[31] The Defendant adamantly disputes Plaintiff's allegation that they denied her an assistant director. Doc. No. 24, at 2–3. Rather, Defendant contends Plaintiff was instructed to submit a job description and take additional steps, but she failed to follow through. *See* Joseph Dep. Tr. at 25:22–27:18.

[32] At Plaintiff's deposition, she even conceded as much, speculating instead that her supervisors believed she "could do everything" and therefore did not need an assistant director. *See* Pl. Dep. Tr. at 64:10–12.

Accordingly, even when considering all of Plaintiff's arguments together, she has failed to point to sufficient evidence from which a factfinder could reasonably conclude that the Defendant's reasons for her removal were pretext for intentional gender discrimination. Defendants are therefore entitled to judgment on this claim as a matter of law.[33]

### A. Retaliation Claims.

In addition to her gender discrimination claim, Plaintiff contends that the Defendant unlawfully retaliated against her for requesting disability accommodations and for reporting an allegedly hostile work environment. *See* Doc. No. 23-2, at 10–11.

Both the ADA and Title VII prohibit employers from retaliating against employees for engaging in conduct that is protected under those acts.[34] *See Krouse v. Am. Sterilizr Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (ADA); *Kengerski v. Harper*, 6 F. 4th 531, 536 (3d Cir. 2021) (Title VII). Like other discrimination claims brought pursuant to those acts, retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Williams v. Phila. Housing Authority Police Dep't*, 380 F.3d 751, 759 & n.3 (3d Cir. 2004) (ADA), *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187–89 & n.30 (3d Cir. 2019); *Kengerski*, 6 F.4th at 536 & n.3 (Title VII). As described above, the first step of this framework requires the plaintiff to present a *prima facie* case. *See Williams*, 380 F.3d at 759 (ADA); *Kengerski*, 6 F.4th at 536 (Title VII). To state a *prima facie* case for retaliation, the plaintiff must show that (1) she engaged in protected activity, (2) she suffered an

---

[33] In her Complaint, Plaintiff seemingly raises a Title VII discrimination claim based on Defendant denying her tenure. *See* Doc. No. 1, at ¶ 21 (alleging that Plaintiff was denied tenure when similarly situated white males were granted tenure). However, Plaintiff subsequently testified that she has never applied for nor was ever denied tenure, *see* Pl. Dep. Tr. at 216:2–218:12, and therefore, Defendant is entitled to summary judgment on any claim premised on a denial of tenure.

[34] Retaliation claims under Title VII, the ADA, and the PHRA are analyzed under the same framework. *See Connelly v. Lane Construction Corp.*, 809 F.3d 780, 791 n.9 (3d Cir. 2016). As such, the above analysis applies equally to the Plaintiff's PHRA retaliation claims.

adverse employment action, and (3) there is a "causal connection" between the protected activity and adverse action. *See Williams*, 380 F.3d at 759 (ADA); *Kengerski*, 6 F.4th at 536 (Title VII).

Here, the Plaintiff fails to state a *prima face* case of Title VII retaliation because she has not shown that she engaged in any activity protected by Title VII. The complaint about a hostile work environment that Plaintiff references in her briefing was simply too attenuated from the conduct protected by Title VII to be sufficient. *See Kengerski*, 6 4th at 537 ("[A] retaliation claim must be tied to Title VII."). She merely invokes the phrase "hostile work environment" without providing any details describing the allegedly objectionable conduct. *See* Def. App'x at 335 (stating, in her November 2019 letter to Mr. Tanskley, that she is "affected by significant stress and hostility in the work environment from nursing students, parents, and my supervisors to which I will explain in another letter to you"); *see also* Def. App'x at 346 (responding to Mr. Tanksley that she did "not feel comfortable meeting with or discussing accomodations [sic] for my disabilities with my supervisors . . . for fear of *continued* retaliation, harassment, and the continuation of the hostile work environment they perpetuate against me" (emphasis in original)). Instead, she alludes to sending a separate letter on that matter, but no such follow-up is included in the record. *See* Def. App'x at 335. As such, there is no evidence that Plaintiff "complained about the type of conduct that is generally protected by [Title VII], such as discrimination on the basis of race [or gender]." *Id.* This is fatal to her Title VII retaliation claim.

On the other hand, the Plaintiff has presented evidence that she engaged in protected activity under the ADA (requesting reasonable accommodations) and that she suffered an adverse employment action (removed as director) six weeks later.[35] *See Sulima v. Tobyhanna*

---

[35] Exactly six weeks passed between the date that Plaintiff requested accommodations (November 25) and the date she was removed as director (January 6). Because neither party argues that any other dates should be used for the causal connection analysis, I have assumed for purposes of this memorandum opinion that this is the relevant timeframe.

*Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) ("Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation."). However, the parties disagree about whether the temporal proximity between those events is sufficient to demonstrate the requisite "causal connection" needed for the final prong of the *prima facie* case. *See* Doc. No. 23-2, at 10–11; Doc. No. 24, at 3.

Regardless, even assuming *arguendo* that the temporal proximity is enough to proceed past the *prima facie* stage, Plaintiff has not presented evidence that would rebut the Defendant's legitimate, non-discriminatory reasons for removing her as director. Having already rejected the argument that pretext could be established based on "inconsistencies" in the Defendant's proffered justifications for removal, all that remains is Plaintiff's contention that the temporal proximity between her request and removal demonstrates pretext. While temporal proximity may, on its own, be sufficient to establish a causal link, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams*, 380 F.3d at 760 (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 n.9 (3d Cir. 2003)).[36] That is not the case here. *Cf. id.* at 760–61 & n.4 (reasoning that even if the court accepted the plaintiff's calculation that only twenty-nine days elapsed, rather than the two

---

[36] As a threshold matter, Plaintiff must establish that the "individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 197 (3d Cir. 2015). Despite Dr. Joseph testimony to the contrary, Mr. Tanksley admitted at his deposition that he informed Dr. Joseph of the Plaintiff's accommodation request at some point prior to Plaintiff's removal. *See* Tanksley Dep. Tr. at 31:24 –32:7. Therefore, Plaintiff has met this threshold requirement.

months proffered by the defendant, that their holding that the timing was not "unduly suggestive" would still stand). Without more,[37] the Plaintiff cannot defeat summary judgment.[38]

### B. Unpaid Wages Claim.

Finally, Defendant also argues that it is entitled to summary judgment on Plaintiff's Pennsylvania Wage Payment and Collection Law ("WPCL") claim. *See* Doc. No. 18-2, at 22–23.

The WPCL "provides employees a statutory remedy to recover wages and other benefits that are *contractually* due to them." *Oberneder v. Link*, 696 A.2d 148, 150 (Pa. 1997) (emphasis added).[39] Notably, the WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Hirsch v. EPL Technologies, Inc.*, 910 A.2d 84, 88 (Pa. Super. 2006) (quoting *Thomas Jefferson Univ. v.*

---

[37] Where the timing is not unusually suggestive, courts may consider "timing plus other evidence," *see Williams*, 380 F.3d at 760 (quoting *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)), such as "intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action," *see Daniels*, 776 F.3d at 196. Plaintiff has not successfully presented any such evidence.

[38] To the extent Plaintiff also raises a Title VII retaliation claim based on her involvement in a student's complaint of discrimination, I similarly find that summary judgment must be entered on this claim.

On January 3, 2019, Plaintiff was contacted by Dr. Joseph to consider a student's claim that he was unjustly given failing grades in two courses. *See* Pl. Dep. Tr. at 263:19–24. As director, Plaintiff reviewed the instructor's data and overturned one of the failing grades and sustained the other. *See id.* at 259:1–4. Dr. Joseph upheld Plaintiff's determination. *See id.* at 265:21–266:2. Unhappy with this result, the student thereafter filed a PHRA complaint accusing the school of discriminating against him. *See id.* at 259:24–260:2.

Plaintiff included a description of her handling of this student's challenge to his grades in her Complaint filed in this matter. *See* Doc. No. 1, at ¶ 7–9. Interpreting this description as Plaintiff putting forth a claim of Title VII retaliation, Defendant argues that any such claim fails because the facts do not show that Plaintiff engaged in protected activity nor do they establish a causal connection between this activity and her removal as director. Doc. No. 18-2, at 10–12. I need not address the Defendant's former argument because the latter is dispositive. At least one full year passed between Plaintiff's alleged protected activity and the adverse employment action. This lengthy time difference is certainly not "unusually suggestive" of retaliatory motive, and there is no other evidence to support finding a causal link. As such, summary judgment is appropriate.

[39] *See also Scully v. US WATS, Inc.*, 238 F.3d 497, 517 (3d Cir. 2001) ("The WPCL provides a statutory remedy to employees whose . . . employers fail to timely pay earned compensation.").

*Wapner*, 903 A.2d 565, 574 (Pa. Super. 2006)).[40] As such, the contract or agreement between the parties is essential in determining whether specific wages are owed. *See, e.g.*, *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990); *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 957 (Pa. Super. 2011). Oftentimes, that agreement will be a formal written contract, but a plaintiff may still succeed on a WPCL claim even without such an arrangement, if "at a minimum," the employee establishes the existence of "an implied oral contract." *See Braun*, at 24 A.3d at 954 (citing to *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)).

Plaintiff has not done that here. Her WPCL claim is premised on her dissatisfaction with the pay she received for teaching the NCLEX learning community course in the summer of 2019. Doc. No. 23-2, at 11; *see also* Pl. Dep. Tr. at 220:18–21, Doc. No. 1, at ¶¶ 32–36.[41] She alleges that she is still owed $4,290 for this work. *Id.* at 222:18–22, 224:22–23. However, Plaintiff admits that for summer classes, the University "pay[s] you what they want to pay you, basically," *see id.* at 225:10–11, and that there was no agreement or contract in place prior to the classes being taught, *see id.* at 226:21–24. Rather, Plaintiff attempted to calculate, after she finished teaching the classes, how much she thought she should be paid considering the amount of time she spent with students over the summer and the credit hours assigned to the courses she taught. *See id.* at 225:12–19. Significantly, Plaintiff believes her co-worker Sadie was paid at a higher rate for teaching summer classes, and this appears to be the foundation of her grievance over her summer 2019 pay. *See id.* at 234:14–24; Doc. No. 23-2, at 11.

---

[40] *See also Scully*, 238 F.3d at 516–17 ("Numerous decisions have held that the WPCL does not create a new right to compensation, but rather, merely establishes a right to enforce payment of wages and compensation that the employer has legally obligated itself to pay.").

[41] Although the Plaintiff's Complaint references unpaid wages for both the summer of 2019 and summer of 2020, Plaintiff conceded at her deposition that she was paid all of her wages for her work during 2020. Pl. Dep. Tr. at 220:4–17, 228:14–234:1. Therefore, I find that there is no genuine dispute of material fact as to the WPCL claim related to the summer of 2020, and Defendant is entitled to summary judgment on that claim.

Even when considering these allegations in the light most favorable to the Plaintiff, as I must, there is no record evidence of an agreement—express or implied—between the Defendant and Plaintiff for the payment of an additional $4,000. Most significantly, Plaintiff admitted at her deposition that there was *no agreement* regarding the rate of pay for those summer courses, and she has presented no other evidence that suggests that such an agreement existed.[42] This is fatal to her WPCL claim. *See, e.g.*, *Weldon*, 896 F.2d at 801 (affirming grant of summary judgment on WPCL claim where there was no express or implied contractual obligation to pay certain wages); *Grabowski v. Dietz & Watson, Inc.*, No. 16-5472, 2017 WL 4284115, at *3 (E.D. Pa. Sept. 27, 2 017) ("[W]hen a plaintiff does plead the existence of a contract, the defendant's obligation to pay the *specific* wages sought by the plaintiff must flow from the governing contract."); *Braun*, 24 A.3d at 957 ("'Whether specific wages are due is determined by the terms of the contract.' Courts have refused to find a contractual right to payment when an employee offers no evidence in support of that right." (citations omitted) (quoting *Doe v. Kohn, Nast & Graf, P.C.*, 862 F. Supp. 1310, 1325 (E.D. Pa. 1994))). Therefore, I grant summary judgment to the Defendant on this claim.

---

[42] Although Plaintiff attempted to calculate the rate of pay that she believes she is owed during her deposition, she did not explain how she arrived at those numbers, nor did she suggest that there was an express or implied agreement with the Defendant as to that rate. Indeed, her testimony at the deposition was to the contrary. Moreover, Plaintiff's reliance on her coworker's compensation fails to remedy this defect.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant Lincoln University's motion for summary judgment is granted. An appropriate order follows.

BY THE COURT:


_s/Pamela A. Carlos_____
PAMELA A. CARLOS
U.S. Magistrate Judge